**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**BALTIMORE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATES OF ILLINOIS, CALIFORNIA, FLORIDA, TEXAS, DELAWARE, HAWAII, INDIANA, LOUISIANA, NEW HAMPSHIRE, NEVADA, TENNESSEE, MICHIGAN, NEW MEXICO, NEW YORK; the COMMON-WEALTHS OF MASSACHUSETTS and VIRGINIA; and the DISTRICT OF COLUMBIA *ex rel.* Jim Conrad, | CIVIL ACTION NO. RDB-07-cv-3176 |
| Plaintiffs and Relator, | |
| v. | **THIRD AMENDED COMPLAINT** |
| GRIFOLS BIOLOGICALS INC., BAXTER HEALTHCARE CORPORATION, and NOVARTIS CONSUMER HEALTH, INC., | |
| Defendants. | |

I.    **BACKGROUND**

1.    Relator Jim Conrad brings this action on behalf of the United States of America ("United States") for treble damages and civil penalties arising from Defendants' conduct in violation of the United States Civil False Claims Act, 31 U.S.C. §§ 3729-3733.

2.    This action is also brought under the respective *qui tam* provisions of False Claims Acts (or similarly named) on behalf of the State of Illinois, the State of California, the State of Florida, the State of Texas;; the State of Delaware, the State of Hawaii, the State of Indiana, the State of Louisiana, the State of New Hampshire, the State of Nevada, the State of Tennessee, the State of Michigan, the State of New Mexico, and the State of New York; the Commonwealth of Massachusetts and the Commonwealth of Virginia; and the District of Columbia.  These states,

along with the United States, are hereinafter collectively referred to as the "Government."

3.  The unlawful scheme is straightforward. Defendants reported their drugs and biological products (hereinafter collectively called "drugs") as "noninnovators" (instead of by their proper designation, "innovators") under the Medicaid Drug Rebate Program ("Rebate Program").

4.  As a result of their unlawful classifications, Defendants paid rebates on their drug sales to Medicaid which were substantially below what the law required, thereby damaging the Government.

5.  Defendants were able to perpetrate this deception because the Medicaid Rebate Program is predicated on honest designation of drug status by manufacturers and labelers.

6.  Defendants' false statements regarding the nature of their covered outpatient drugs reduced the rebates each of them owed under the Rebate Program. This reduction correlated to (1) an increase in the amount each State expended to support its Medicaid program, and (2) an increase in the contribution of the United States to State Medicaid programs.

7.  Defendants knew that CMS and the State Medicaid Agencies relied on them to provide accurate information when representing the status of their Covered Outpatient Drugs, and therefore knew that their representations were preconditions to payment.

8.  Defendants knew that by falsely representing their covered outpatient drugs as noninnovators, they were causing the financially-strapped Medicaid program, which was created to provide taxpayer-funded health care to poor and infirm Americans, to spend more money on their products than they were permitted by law to collect.

9.  Defendants are voluntary participants in the Medicaid program, and are charged with knowledge of the requirements of federal and state law.

10.     By reporting false information to CMS, each Defendant was, at a minimum, recklessly indifferent to its legal obligations.  Their conduct was therefore "knowing" as that term is defined in the False Claims Act, 31 U.S.C. § 3729(b).

## II.     JURISDICTION AND VENUE

11.     The acts proscribed by 31 U.S.C. § 3729(a) and complained of herein occurred in the District of Maryland and elsewhere, as Defendants do business in the District of Maryland and throughout the United States.  Therefore, this Court has jurisdiction over this case pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1345.  This Court has supplemental jurisdiction over this case for the claims brought on behalf of the States pursuant to 31 U.S.C. §3732(b) and/or 28 U.S.C. § 1367, because the recovery sought for them arises from the same transactions and occurrences as the claims brought on behalf of the United States.

12.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), and 28 U.S.C. § 1391(b) and (c), because all Defendants transact business in this District, and one or more of the acts committed by each Defendant and proscribed by 31 U.S.C. § 3729 occurred in this District.

## III.    PARTIES

13.     The United States funds the provision of medical care, including pharmaceutical products, for eligible citizens through Government Healthcare Programs to include Medicare, Medicaid, TRICARE, and other agencies and programs, acting through the Centers for Medicare & Medicaid Services ("CMS") within the U.S. Department of Health and Human Services ("HHS"), the Department of Defense, and other federal agencies.

14.     All states provide care to eligible persons under State Medicaid programs. Medicaid is an entitlement program funded by federal and state taxes that purchases basic heath

services on behalf of certain low-income people. More than half are children; about a fifth are low-income parents; about a sixth are low-income individuals with disabilities; and the remainder are low-income elderly people, most of whom are also enrolled in Medicare. The federal government matches all allowable state expenditures in a percentage which varies from state to state.

15.     Relator Jim Conrad is a resident of the state of Pennsylvania. Relator brings this action based upon his independent and direct knowledge.

16.     Defendant Grifols Biologicals, Inc. ("Grifols"), f/k/a Alpha Therapeutic Corporation, is a California corporation with its principal place of business in Los Angeles, CA. In 2002, Grifols, Inc. acquired the facilities and the rights to certain biological products of Alpha Therapeutic Corporation, including those at issue in this Complaint: Profilnine Sd Factor IX Complex (Kit); Alpha Nine; Alphanate; and Venoglobulin-S 10% Immune Globulin Intravenous (human).

17.     Defendant Baxter Healthcare Corporation ("Baxter") is a Delaware corporation with its principal place of business in Deerfield, Illinois. Baxter's biological products Iveegam E/N and Bebulin VH are at issue in this Complaint.

18.     Defendant Novartis Consumer Health, Inc. ("Novartis") is an Illinois corporation with its principal place of business in Saint Charles, Illinois. It is a subsidiary of Novartis Pharmaceuticals Corporation. Novartis' drug Habitrol is at issue in this Complaint.

19.     At all times relevant hereto, Defendants acted through their agents and employees and the acts of Defendants agents and employees were within the scope of their agency and employment. The policies and practices alleged in this Complaint were, on information and belief,

set or ratified at the highest corporate levels of Defendants.

## IV.    THE FALSE CLAIMS ACT

20.    The FCA was originally enacted in 1863, and was substantially amended in 1986 by the False Claims Amendments Act, Pub.L. 99-562, 100 Stat. 3153.  Congress enacted the 1986 amendments to enhance and modernize the Government's tools for recovering losses sustained by frauds against it after finding that federal program fraud was pervasive.  The amendments were intended to create incentives for individuals with knowledge of Government frauds to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit resources to prosecuting fraud on the Government's behalf.

21.    The Act provides that any person who presents, or causes to be presented, false or fraudulent claims for payment or approval to the United States Government, or knowingly makes, uses, or causes to be made or used false records and statements to induce the Government to pay or approve false and fraudulent claims, is liable for a civil penalty ranging from $5,000 up to $10,000 for each such claim, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus three times the amount of the damages sustained by the Government.

## V.    MEDICAID OUTPATIENT PRESCRIPTION DRUG COVERAGE

22.    The United States created the Medicaid program in 1965 as a cooperative undertaking between the federal and state governments to help the states provide health care to low-income individuals.

23.    CMS oversees the Medicaid programs in each state. The Medicaid program pays for services pursuant to plans developed by the states and approved by the Secretary of HHS,

through CMS.  *See* 42 U.S.C. § 1396a(a)-(b).  States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical items and services according to established rates.  *See* 42 U.S.C. § 1396b(a)(1), 1903(a)(1).  The federal government then pays each state a statutorily established share of "the total amount expended ... as medical assistance under the State plan ..." *See* 42 U.S.C. §1396b(a)(1)  This federal-to-state payment is known as Federal Financial Participation ("FFP").

24.     States must submit a "State Plan" meeting the Medicaid statute and rules of the Secretary of HHS.  42 U.S.C. § 1396a. The State Plan defines how each state will operate its Medicaid program.  The State Plan addresses the areas of state program administration, Medicaid eligibility criteria, service coverage, and provider reimbursement.

25.     While state participation in Medicaid is voluntary, all states participate. Participating states must comply with all federal statutory and regulatory requirements. The Medicaid plan proposed by each state must be approved by the federal government. *See* 42 U.S.C. § 1396a(a) and (b).

A.     **The Medicaid Drug Rebate Program**

26.     Pharmaceutical manufacturers and labelers participating in Medicaid programs rebate to the states a portion of the price of drugs purchased for Medicaid beneficiaries.  42 U.S.C. §1396r-8(a)(1).  Manufacturers/labelers do this because the Medicaid statute, 42 U.S.C. §§1396a-1396u, permits the United States to reimburse states only for "covered outpatient drugs" purchased from manufacturers/labelers that have agreed to pay statutorily specified rebates to those states.  42 U.S.C. §1396r-8(a)(1).  Thus, manufacturers/labelers that want their drugs available to Medicaid beneficiaries under the Medicaid program must enter into a Medicaid Drug

Rebate Agreement (Rebate Agreement) with the Secretary of Health and Human Services, that is in all material respects identical to the Model Rebate Agreement attached hereto as Exhibit A.

27.     Congress created the Rebate Program to help reduce State Medicaid drug expenditures.

28.     Submission of truthful rebate agreements is a condition of payment under the Rebate Program.

29.     When entering into a Rebate Agreement, a manufacturer/labeler agrees to certain reporting and rebate payment requirements.  The Rebate Agreement provides, under the heading "MANUFACTURER'S RESPONSIBILITIES," that

> In order for the Secretary to authorize that a State receive payment for the Manufacturer's drugs under Title XIX of the Act, 42 U.S.C. Section 1396 *et seq.*, the Manufacturer agrees to the following:
>
> (a)     To calculate and . . . to make a Rebate Payment to each State Medicaid Agency for the Manufacturer's Covered Outpatient Drugs paid for by the State Medicaid Agency during a quarter.

30.     "Rebate Payment" is defined as, "with respect to the Manufacturer's Covered Outpatient Drugs, the quarterly payment by the Manufacturer to the State Medicaid Agency, calculated in accordance with section 1927 of the Act *and the provisions of this agreement.*" Model Rebate Agreement, Exhibit A at II(a) (emphasis supplied).

31.     At the end of each calendar quarter, CMS calculates the rebate percentages for each covered outpatient drug, and transmits that information to State Medicaid Agencies.  State Medicaid Agencies then calculate the rebate for each covered outpatient drug by multiplying the rebate percentage by quarterly utilization.  Finally, State Medicaid Agencies invoice each

manufacturer/labeler for its respective rebates.

32.     State Medicaid Agencies submit two reports to CMS every quarter: Form CMS-37 (Medicaid Program Budget Report) and Form CMS-64 (Quarterly Medicaid Statement of Expenditures).  These reports set forth the States' expected and actual quarterly Medicaid expenditures.  On the basis of these reports, CMS calculates the Federal Financial Participation which is owed each state.

33.     Medicaid expenditures are reported to CMS as net figures.  Thus, the calculation of expenditures takes into account rebates received from manufacturers/labelers pursuant to the Rebate Program.  Drug rebates reduce the aggregate Medicaid expenditures reported to CMS, and thereby reduce Federal Financial Participation.

34.      When a manufacturer/labeler reduces the amount of the rebate it owes by providing false information in its Quarterly Reports, its malfeasance increases both State Medicaid expenditures and Federal Financial Participation.

**B.     Reporting Drug Status to Determine Rebate Percentage**

35.     Manufacturers/labelers are required to classify each covered outpatient drug into one of the following three categories: (1) innovator multiple source drug, 2) single source drug, or 3) noninnovator multiple source drug.   A covered outpatient drug's category is commonly known and  referred to herein as its "drug status."

36.     Manufacturers/labelers make this designation electronically every quarter following their execution of a Rebate Agreement, as part of the submission of their "Quarterly Report/Pricing Data."  Drugs are identified in Quarterly Reports by 11-digit National Drug Codes ("NDCs").  NDCs identify unique formulations of each drug, including the manufacturer,

-8-

strength, and package size. Quarterly Reports also include the drug status as designated by the manufacturer/labeler.

37. Innovator multiple source drug is defined as "a multiple source drug that was originally marketed under an original new drug application approved by the Food and Drug Administration." 42 U.S.C. §1396r-8 (k)(7)(A)(ii).

38. Single source drug is defined as "a covered outpatient drug which is produced or distributed under an original new drug application approved by the Food and Drug Administration, including a drug product marketed by any cross-licensed producers or distributors operating under the new drug application." 42 U.S.C. §1396r-8 (k)(7)(A)(iii).

39. Both single source and innovator multiple source drugs are commonly known and referred to herein as either "brand name drugs" or "innovators."

40. Noninnovator multiple source drugs are commonly known and referred to herein as "generic drugs" or "noninnovators."

41. The Rebate Program treats innovators quite differently than noninnovators. The innovator rebate has two distinct components. First, the manufacturer/labeler of an innovator must pay a "basic rebate" equal to the greater of (1) 15.1 percent of the "Average Manufacturer Price" (AMP) of the drug or (2) the difference between the drug's AMP and its "Best Price" (BP), whichever is greater. The manufacturer/labeler of an innovator must also pay an "additional" rebate if and to the extent that the AMP of the drug has increased faster than the rate of inflation since the drug entered the market.

42. Manufacturers/labelers of innovators almost always owe the additional rebate. In 2003, for instance, additional rebates were owed on approximately 84% of innovators.

43.     The combined "basic" and "additional" rebates for innovators typically exceeds 25% of AMP.

44.     The rebate for noninnovators is 11% of AMP, with *no* additional rebate. 42 U.S.C. § 1396r-8(c)(3).  Thus, the innovator rebate is a minimum of 4.1% below the innovator rebate.

45.     The rebate for a drug characterized by the manufacturer/labeler as an innovator is *always* higher than the rebate for the same drug characterized by the manufacturer/labeler as a noninnovator, and is generally more than double.

46.     By reporting an innovator as a noninnovator, a manufacturer/labeler causes State Medicaid Agencies to invoice substantially lower rebates than required by the Rebate Program.

## VI.     SUBSTANTIVE ALLEGATIONS

47.     In order to decrease their respective rebates owed to the states pursuant to the Rebate Program, Defendants misrepresented material facts regarding the status of their innovators by representing them as noninnovators.

48.     Defendants repeatedly submitted false records and statements to the United States. Initially, upon executing their respective Rebate Agreements with the Secretary of Health and Human Services, Defendants submitted "baseline" product data to CMS about their covered outpatient drugs which misrepresented the status of some of the drugs by designating them noninnovators when in truth they were innovators.  On a quarterly basis thereafter, Defendants continued to misrepresent the status of these drugs in Quarterly Reports submitted electronically to CMS.

49.     Had Defendants truthfully reported their drugs as innovators, they would have had to pay substantially higher rebates to the State Medicaid Programs and the Federal Financial

-10-

Participation paid by the United States would have been lower.

50.     Accordingly, each Defendant prepared and submitted false records to CMS to conceal, avoid or decrease an obligation to pay or transmit money to the Government.  In turn, State Medicaid Agencies issued quarterly invoices to each Defendant, generally in the form and content set forth in Exhibit B attached hereto. State Medicaid Agencies prepared said invoices based upon a reduced amount as if the subject drugs were noninnovators, when in truth they were innovators and should have been designated as single source or innovator multiple source drugs, not noninnovator multiple source drugs.

51.     Because the federal financial participation is computed after the rebate, the states and the federal government both share in the Medicaid savings from the rebate, and therefore both have been damaged by the Defendants' false statements. Each Defendant's false statements caused it to pay less in rebates than it owed, and each would have been invoiced for higher amounts had it truthfully reported the status of the drugs at issue in this Complaint.

52.      Approval for a drug begins with the manufacturer submitting an application to the FDA.  In the case of a new, the application submitted is called a New Drug Application ("NDA").

53.     The term "authorized generic" is used to refer to the action of manufacturer repackaging its own brand name drug and marketing it as a "generic."  Determined to maintain their market share, manufacturers recognize that by simply changing the label of their brand name drugs, they can compete directly against the generics with a "generic" alternative of their own. In reality, however, it is the same drug as the name brand drug approved under an original NDA, and is thus an innovator under the Rebate Program.

54.     In a letter dated March 18, 2005, a copy of which is attached as Exhibit C, FDA

Commissioner Mark McClellan, M.D. stated CMS's long standing position:

> With respect to authorized generics, it is CMS's position that such multiple source drugs marketed under a New Drug Application approved by the Food and Drug Administration should be classified as an innovator multiple source drug.

55.     HABITROL (Nicotine transdermal system) 21, 14, and 7 mg/day patches were approved by the FDA on November 27, 1991 through a New Drug Application (No. 020076) submitted by Defendant, Novartis.

56.     Nicotine-based smoking cessation products were cleared by the FDA for over-the-counter distribution in 1996.

57.     On November 12, 1999, Novartis's supplemental NDA was approved, which provides for over-the-counter ("OTC") marketing of Habitrol (Nicotine transdermal system) 21, 14, and 7 mg/day patches.

58.     In documents submitted to CMS, Novartis listed Nicotine products labeled as 00067-0213 (7 mg) , 00067-0214 (14 mg), 00067-0215 (21 mg), as noninnovators, but in truth and fact they are actually authorized generic drugs, and thus innovators, operating under the Habitrol NDA.

59.     Identical Novartis products with NDC numbers 00067-5124 (7 mg), 00067-5125 (14 mg) and 00067-5126 (21 mg) have been listed as innovators by Novartis.

60.     In addition, Nicoderm CQ (Nicotine transdermal system) 21, 14, and 7 mg/day patches became FDA-approved on November 7, 1991 through a New Drug Application submitted by non-party Sanofi Aventis US.  On August 2, 1996 non-party Sanofi's supplemental NDA was approved which provided  for over-the-counter marketing of Nicoderm CQ.  These drugs, while

identical to Habitrol, have always been listed as innovators and therefore non-party Sanofi, has

always paid the higher rebate amount.

### B. Biologicals

61.     Unlike drugs, which are approved via an NDA, a biological(that is, a product

derived from a living source) can be marketed only upon approval of an application for an original

Biologic License Applicant ("BLA"), formerly known as a Product License Application ("PLA").

62.     The regulatory regime for biologicals does not include a separate process for

generics. As a result, biologicals enjoy monopoly pricing similar to brand name drugs.

63.     The Rebate Agreement makes clear that biological products are innovators by

defining products approved by a "PLA." The relevant definitions in the Rebate Agreement are:

> (k) "Innovator Multiple Source Drug" will have the meaning set
> forth in Section 1927(k)(7)(A)(ii) of the Act and shall include all
> Covered Outpatient Drugs approved under a New Drug Applica-
> tion (NDA), *Product License Approval (PLA)*, Establishment
> License Approval (ELA) or Antibiotic Drug Approval (ADA). A
> Covered Outpatient Drug marketed by a cross-licensed producer or
> distributor under the approved NDA shall be included as an
> innovator multiple source drug when the drug product meets this
> definition.

> (z) "Single Source Drug" will have the meaning set forth in Section
> 1927(k)(7)(A)(iv) of the Act. It also includes a *Covered Outpatient
> Drug approved under a PLA*, ELA or ABA.  (emphasis supplied).

64.      "PLA" is the term that the FDA used through the mid-1990's, for what is now

known as a Biologics License Application. Because the Rebate Agreement was drafted prior to

this change, it refers to a "PLA."

65.     By executing the Rebate Agreement, Defendants Grifols and Baxter agreed to the

mandatory classification of their biologicals as innovators—either as single source drugs or as

-13-

innovator multiple source drugs.

66.     Manufacturers in competition with Grifols and Baxter with biologicals intended to treat the same diseases or conditions have properly reported their biologicals as innovators. Thus, because of their honest reporting, Defendants' competitors have paid higher rebates on their biologicals.

67.     There are six  biologicals made up of "Factor IX," approved to prevent or control excessive bleeding in people with  Hemophilia B. Three of them have been falsely designated. These are:

a.      AlphaNine, a  Factor IX covered outpatient drug manufactured and sold by Grifols, received FDA approval through a PLA on December 31, 1990. For each quarter beginning in 2002 and continuing through as late as 2006-07, Grifols knowingly submitted Quarterly Reports which falsely represented that AlphaNine was a noninnovator, and as a direct and proximate result of these knowing false statements, Grifols paid lower rebates for AlphaNine than had it reported truthfully. AlphaNine has been correctly reported by Defendant Grifols as an innovator since 2006-07.

b.      Profilnine SD, a Factor IX covered outpatient drug manufactured and sold by Grifols, was FDA-approved by PLA on July 20,1981. For each quarter in the years 2002 through, upon information and belief, 2006/2007, Grifols knowingly submitted Quarterly Reports which falsely represented that Profilnine SD was a noninnovator, and as a direct and proximate result of these knowing false statements, paid lower rebates for Profilnine SD than had it reported truthfully. Profilnine SP is now correctly listed by Defendant Grifols as an innovator.

c.      Bebulin VH, a Factor IX covered outpatient drugs manufactured and sold by Baxter, was approved by the FDA on August 19, 1992.  From 2002 through at least 2009, Baxter knowingly submitted quarterly reports which falsely represented that Bebulin VH was a noninnovator.  As a direct and proximate result of these knowing false statements, paid lower rebates for Bebulin VH than had it reported truthfully.

68.     There are about thirteen Immune Globulin Intravenous (IVIG) biologicals on the market, and while they have multiple different overlapping indications, they all are indicated for

-14-

primary humoral immunodeficiency. Two out of the thirteen have been improperly designated

with the incorrect status by Defendants Grifols and Baxter.

a. Venoglobulin-S, an IVIG biological manufactured and sold by Grifols, received FDA approval in 1992. Grifols knowingly submitted Quarterly Reports which falsely represented that Venoglobulin-S was a noninnovator, and as a direct and proximate result of these knowing false statements, paid lower rebates for Venoglobulin-S than had it reported truthfully. Venoglobulin-S is now correctly listed by Defendant Grifols as an innovator.

b. Iveegam E/N, an IVIG biological manufactured and sold by Baxter, received FDA approval by PLA in February 1986. From 2002 to at least 2009, Defendant Baxter knowingly submitted Quarterly Reports which falsely represented that Venoglobulin-S was a noninnovator, and as a direct and proximate result of these knowing false statements, paid lower rebates for Venoglobulin-S than had it reported truthfully.

69. All other IVIGs, including Carimune, Flebogamma, Gamimune N 10%, Gamma-gard, Gammagard S/D, Gammar-P.I.V., Gamunex, Octagam, Panglobulin NF, Polygam S/D, and Sandoglobulin have been correctly designated as innovators at all times.

70. There are approximately ten Factor VIII biologicals on the market, including Humate P, and all but one have been designated correctly as innovators by their manufacturers: Alphanate is an Antihemophelic Factor/von Willebrand Factor VIII Complex manufactured and sold by Grifols. From 2002 through, upon information and belief, 2006/2007, Grifols knowingly submitted Quarterly Reports which falsely represented that Alphanate was a Non-innovator drug, and as a direct and proximate result of these knowing false statements, paid lower rebates for Venoglobulin-S than had it reported truthfully.

**CLAIMS FOR RELIEF**

**COUNT I**
**Violations of 31 U.S.C. § 3729(a)(1) and (a)(2)**

-15-

71.     Relator realleges and incorporates by reference ¶¶ 1–71 as though fully set forth herein.

72.     Defendants knowingly caused State Medicaid Agencies nationwide to present false claims to CMS for the payment of pharmaceuticals, in violation of 31 U.S.C. § 3731(a)(1). Defendants also knowingly created and used false records in order to get false claims paid by CMS, in violation of 31 U.S.C. § 3731(a)(2).

73.     Medicaid only pays for covered outpatient drugs manufactured by pharmaceutical companies that have executed Medicaid Drug Rebate Agreements with the Secretary of Health and Human Services.  In order for CMS to authorize that a State receive payment for covered drugs, the manufacturer must agree to abide by the terms of its rebate agreement, including the submission of accurate Quarterly Reports, and must submit accurate and complete data regarding its drugs.

74.     Thus, as a condition of Medicaid payment for their outpatient drugs, Defendant manufacturers know that they must enter into and abide by a Rebate Agreement with the United States.

75.     Each Defendant has entered into a Rebate Agreement with the United States in order to authorize payment by State Medicaid Programs for its covered outpatient drugs, including the drugs identified herein.

76.     However, throughout the period described herein, Defendants violated the terms of their rebate agreements, by falsely classifying their outpatient drugs and, in turn, reducing the rebates owed for those drugs under those agreements.  Specifically, Defendants submitted Quarterly Reports using Form CMS-367 to CMS in which they falsely represented the covered

-16-

outpatient drugs identified herein as noninnovator multiple source drugs, when in fact these drugs were innovators. Defendants knew that claims for the drugs identified herein were being submitted for Medicaid payment. Defendants knew its affirmative false representations regarding those drugs resulted in the creation and submission of a false Rebate Agreement and false Quarterly Reports to CMS.

77. Because the rebate agreement is a precondition for Medicaid reimbursement for Defendants' drugs, Defendants knew that their scheme materially affected the United States' decision to authorize payment for claims for their drugs and, as such, caused the submission of false claims for Medicaid reimbursement.

78. Defendants acted knowingly.

79. In reliance on Defendants' false representations, State Medicaid Agencies paid claims from pharmacies and other suppliers for the drugs identified herein and then presented claims to CMS for the federal share of those claims.

80. As a result of the Defendant's conduct in knowingly causing the Secretary to authorize payment for drugs which were not eligible for reimbursement, these claims are false.

81. Defendants knowingly caused the presentation of false claims to the United States in violation of 31 U.S.C. § 3729(a)(1).

82. By creating and submitted false Quarterly Statements, Defendants also knowingly created and used false records in order to get false claims paid by the United States, in violation of 31 U.S.C. § 3731(a)(2).

## COUNT II
### Violations of 31 U.S.C. § 3729(a)(7)

83.     Relator realleges and incorporates by reference ¶¶ 1–82 as though fully set forth herein.

84.     Defendants knowingly created and used false records in order to decrease their respective obligations to pay rebates to State Medicaid Agencies and, in turn, to CMS, pursuant to the Medicaid Drug Rebate Program, in violation of 31 U.S.C. § 3729(a)(7).

85.     Medicaid only pays for covered outpatient drugs manufactured by pharmaceutical manufacturers that have entered into a Medicaid Drug Rebate Agreement with the Secretary of Health and Human Services.  Thus, execution of a Rebate Agreement is a condition of Medicaid reimbursement for Defendants' drugs.

86.     Each Defendant has entered into a Rebate Agreement with the Secretary of Health and Human Services in order to authorize payment by State Medicaid Programs for its covered outpatient drugs, including the drugs identified herein.

87.     The Rebate Agreement requires Defendants to submit accurate Quarterly Reports to CMS.  These Quarterly Reports trigger invoices from State Medicaid Agencies for the rebates owed for the manufacturers' covered outpatient drugs.   The Rebate Agreement requires Defendants to make rebate payments for each calendar quarter within 30 days after receiving invoices from State Medicaid Agencies.  The Rebate Agreement requires each Defendant to make a rebate payment on all the Defendant's covered outpatient drugs for as long as an agreement with the Secretary of Health and Human Services is in force and invoices are received from State Medicaid Agencies.

88.     The rebates owed by Defendants during the life of the Rebate Agreement are specific, legal obligations that  Defendants have a statutory duty to pay at the time of invoicing in

-18-

order for the United States to authorize payment for the drugs identified herein.

89.     Notwithstanding these obligations, Defendants violated the terms of their respective Rebate Agreements throughout the period described herein, by falsely classifying their covered outpatient drugs and, in turn, reducing the rebates owed for those drugs under those agreements. Specifically, Defendants submitted Quarterly Reports using Form CMS-367 to CMS in which they falsely classified the covered outpatient drugs identified herein as noninnovator multiple source drugs, when in fact the drugs were innovators. Defendants knew their affirmative false representations regarding those drugs resulted in the creation and submission of false Quarterly Reports to CMS and falsely reduced their obligation to the United States.

90.     Defendants acted knowingly.

91.     Defendants knowingly created and used false records—specifically, false Quarterly Reports—to reduce rebates they owed to State Medicaid Agencies and CMS pursuant to the Medicaid Drug Rebate Program, in violation of 31 U.S.C. § 3729(a)(7).

92.     As a consequence of Defendants' knowing submission of false Quarterly Reports and withholding of owed rebate amounts, the United States has been duped into exhausting significant additional, unnecessary funds to support State Medicaid programs.

## COUNT III
### Violations of 740 Ill. Comp. Stat. 175/3(a)(1), (a)(2), and (a)(7)

93.     Relator realleges and incorporates by reference ¶¶ 1–92 as though fully set forth herein.

94.     Defendants knowingly caused the presentation of false claims to the Illinois Department of Health and Family Services, in violation of 740 Ill. Comp. Stat. 175/3(a)(1);

-19-

knowingly created and used false records in order to get false claims paid by the Illinois

Department of Health and Family Services, in violation of 740 Ill. Comp. Stat. 175/3(a)(2); and

knowingly created and used false records to decrease their respective obligations to pay rebates to

the Illinois Department of Health and Family Services pursuant to the Medicaid Drug Rebate

Program, in violation of 740 Ill. Comp. Stat. 175/3(a)(7).

95.     Medicaid only pays for covered outpatient drugs manufactured by pharmaceutical

manufacturers that have entered into a Medicaid Drug Rebate Agreement with the Secretary of

Health and Human Services.  Thus, as a condition of Medicaid reimbursement for their covered

outpatient drugs, Defendants know that they must enter into and abide by the terms of the Rebate

Agreement, including the submission of accurate Quarterly Reports.

96.     Each Defendant has entered into a Rebate Agreement with the Secretary of Health

and Human Services in order to authorize payment by State Medicaid Programs for its covered

outpatient drugs, including the drugs identified herein.

97.     However, throughout the period described herein, Defendants violated the terms

of their respective Rebate Agreements by falsely classifying their covered outpatient drugs for the

purpose of reducing the rebates owed for those drugs under those agreements.  Specifically,

Defendants submitted Quarterly Reports using Form CMS-367 to CMS in which they falsely

classified the covered outpatient drugs identified herein_ as noninnovator multiple source drugs,

when in fact the drugs were innovators.  Defendants knew their affirmative false representations

regarding those drugs resulted in the creation and submission of false Quarterly Reports to CMS.

98.     Defendants transmitted false Quarterly Reports to CMS knowing that the CMS

would calculate rebate percentages for Defendants' covered outpatient drugs based upon the

inaccurate representations made therein, and that CMS would transmit those rebate percentages

to the Illinois Department of Health and Family Services, the unit of government responsible for

administering the Medicaid program in the State of Illinois.

99.     The Illinois Department of Health and Family Services falls within the definition of

"state" found in 740 Ill. Comp. Stat. 175/2(a).

100.    Defendants acted knowingly.

101.    In reliance on Defendants' false representations, the Illinois Department of Health

and Family Services paid claims from pharmacies and other suppliers for the drugs identified

herein.  Because payment of the claims was conditioned upon Defendants' adherence to the

requirements found in Rebate Agreement, and because the Defendants knowingly violated at least

two of the provisions as described above, the claims were false.

102.    Defendants knowingly caused pharmacies and other suppliers to present false

claims for reimbursement for the drugs listed herein to the Illinois Department of Health and

Family Services, in violation of 740 Ill. Comp. Stat. 175/3(a)(1).

103.    Defendants knowingly created and used false records—specifically, false

Quarterly Reports—to get the false claims described herein paid by the Illinois Department of

Health and Family Services, in violation of 740 Ill. Comp. Stat. 175/3(a)(2).  Because the

submission of accurate Quarterly Reports was a condition of payment under the Medicaid

program, Defendants intended their misrepresentations to be relied upon by the Illinois

Department of Health and Family Services in paying the claims described herein.

104.    The Quarterly Reports trigger invoices from the Illinois Department of Health and

Family Services for the rebates owed for the Defendants' covered outpatient drugs.  The Rebate

Agreement requires Defendants to make rebate payments for each calendar quarter within 30 days after receiving invoices from State Medicaid Agencies. The Rebate Agreement requires each Defendant to make a rebate payment on all the Defendant's covered outpatient drugs for as long as an agreement with the Secretary of Health and Human Services is in force and invoices are received from State Medicaid Agencies, including the Illinois Department of Health and Family Services.

105.    The rebates owed by Defendants during the life of the Rebate Agreement are specific, legal obligations that Defendants have a statutory duty to pay.

106.    Defendants knowingly created and used false records—specifically, false Quarterly Reports—to reduce rebates owed to the Illinois Department of Health and Family Services pursuant to the Medicaid Drug Rebate Program, in violation of 740 Ill. Comp. Stat. 175/3(a)(7).

107.    As a consequence of Defendants' knowing submission of false Quarterly Reports, the State of Illinois has not received the full rebates to which it was entitled pursuant to the Medicaid Drug Rebate Program.

**COUNT IV**
**Violations of Cal. Gov. Code § 12651(a)(1), (a)(2), and (a)(7)**

108.    Relator realleges and incorporates by reference ¶¶ 1–108 as though fully set forth herein.

109.    Defendants knowingly caused the presentation of false claims to the California Department of Health Care Services, in violation of Cal. Gov't Code § 12651(a)(7); knowingly created and used false records in order to get false claims paid by the California Department of

-22-

Health Care Services, in violation of Cal. Gov't Code § 12651(a)(2); and knowingly created and used false records to decrease their respective obligations to pay rebates to the California Department of Health Care Services pursuant to the Medicaid Drug Rebate Program, in violation of Cal. Gov't Code § 12651(a)(7).

110. Medicaid only pays for covered outpatient drugs manufactured by pharmaceutical manufacturers that have entered into a Medicaid Drug Rebate Agreement with the Secretary of Health and Human Services. Thus, as a condition of Medicaid reimbursement for their covered outpatient drugs, Defendants know that they must enter into and abide by the terms of the Rebate Agreement, including the submission of accurate Quarterly Reports.

111. Each Defendant has entered into a Rebate Agreement with the Secretary of Health and Human Services in order to authorize payment by State Medicaid Programs for its covered outpatient drugs, including the drugs identified herein.

112. However, throughout the period described herein, Defendants violated the terms of their respective Rebate Agreements, by falsely classifying their covered outpatient drugs and, in turn, reducing the rebates owed for those drugs under those agreements. Specifically, Defendants submitted Quarterly Reports using Form CMS-367 to CMS in which they falsely classified the covered outpatient drugs identified herein as noninnovator multiple source drugs, when in fact the drugs were innovators. Defendants knew their affirmative false representations regarding those drugs resulted in the creation and submission of false Quarterly Reports to CMS.

113. Defendants transmitted false Quarterly Reports to CMS knowing that CMS would calculate rebate percentages for Defendants' covered outpatient drugs based upon the inaccurate representations made therein, and that CMS would transmit those rebate percentages to the

California Department of Health Care Services, the unit of government responsible for administering the Medicaid program in the State of California.

114. Defendants acted knowingly.

115. In reliance on Defendants' false representations, the California Department of Health Care Services paid claims from pharmacies and other suppliers for the drugs identified herein. Because payment of the claims was conditioned upon Defendants' adherence to the requirements found in Rebate Agreement, and because the Defendants knowingly violated at least two of the provisions as described above, the claims were false

116. Defendants knowingly caused pharmacies and other suppliers to present false claims for reimbursement for drugs listshereinto the California Department of Health Care Services, in violation of Cal. Gov't Code § 1265(a)(1).

117. Defendants knowingly created and used false records—specifically, false Quarterly Reports—to get the false claims described herein paid by the California Department of Health Care Services, in violation of Cal. Gov't Code § 1265(a)(2). Because the submission of accurate Quarterly Reports was a condition of payment under the Medicaid program, Defendants intended their misrepresentations to be relied upon by the California Department of Health Care Services in paying the claims described herein.

118. The Quarterly Reports trigger invoices from the California Department of Health Care Services for the rebates owed for the Defendants' covered outpatient drugs. The Rebate Agreement requires Defendants to make rebate payments for each calendar quarter within 30 days after receiving invoices from State Medicaid Agencies. The Rebate Agreement requires each Defendant to make a rebate payment on all the Defendant's covered outpatient drugs for as long

-24-

as an agreement with the Secretary of Health and Human Services is in force and invoices are received from State Medicaid Agencies, including the California Department of Health Care Services.

119.     The rebates owed by Defendants during the life of the Rebate Agreement are specific, legal obligation that Defendants have a statutory duty to pay.

120.     Defendants knowingly created and used false records—specifically, false Quarterly Reports—to reduce rebates owed to the California Department of Health Care Services pursuant to the Medicaid Drug Rebate Program in violation of Cal. Gov't Code § 1265(a)(7).

121.     As a consequence of Defendants' knowing submission of false Quarterly Reports, the State of California has not received the full rebates to which it was entitled pursuant to the Medicaid Drug Rebate Program.

**COUNT V**
**Violations of Fla. Stat. § 68.082(2)(a), (2)(b), and (2)(g)**

122.     Relator realleges and incorporates by reference ¶¶ 1–121 as though fully set forth herein.

123.     Defendants knowingly caused the presentation of false claims to the Florida Agency of Health Care Administration, in violation of Fla. Stat. § 68.082(2)(a); knowingly created and used false records in order to get false claims paid by the Florida Agency of Health Care Administration, in violation of Fla. Stat. § 68.082(2)(b); and knowingly created and used false records to decrease their respective obligations to pay rebates to the Florida Agency of Health Care Administration pursuant to the Medicaid Drug Rebate Program, in violation of Fla. Stat. § 68.082(2)(g).

-25-

124.     Medicaid only pays for covered outpatient drugs manufactured by pharmaceutical manufacturers that have entered into a Medicaid Drug Rebate Agreement with the Secretary of Health and Human Services.  Thus, as a condition of Medicaid reimbursement for their covered outpatient drugs, Defendants know that they must enter into and abide by the terms of the Rebate Agreement, including the submission of accurate Quarterly Reports.

125.     Each Defendant has entered into a Rebate Agreement with the Secretary of Health and Human Services in order to authorize payment by State Medicaid Programs for its covered outpatient drugs, including the drugs identified herein.

126.     However, throughout the period described herein, Defendants violated the terms of their respective Rebate Agreements by falsely classifying their covered outpatient drugs for the purpose of reducing the rebates owed for those drugs under those agreements.  Specifically, Defendants submitted Quarterly Reports using Form CMS-367 to CMS in which they falsely classified the covered outpatient drugs identified herein as noninnovator multiple source drugs, when in fact the drugs were innovators.  Defendants knew their affirmative false representations regarding those drugs resulted in the creation and submission of false Quarterly Reports to CMS.

127.     Defendants transmitted false Quarterly Reports to CMS knowing that CMS would calculate rebate percentages for Defendants' covered outpatient drugs based upon the inaccurate representations made therein, and that CMS would transmit those rebate percentages to the Florida Agency of Health Care Administration, the unit of government responsible for administering the Medicaid program in the State of Florida.

128.     Defendants acted knowingly.

129.     In reliance on Defendants' false representations, the Florida Agency of Health Care

-26-

Administration paid claims from pharmacies and other suppliers for the drugs identified herein. Because payment of the claims was conditioned upon Defendants' adherence to the requirements found in Rebate Agreement, and because the Defendants knowingly violated at least two of the provisions as described above, the claims were false.

130.     Defendants knowingly caused pharmacies and other suppliers to present false claims for reimbursement for the drugs listed herein to the Florida Agency of Health Care Administration, in violation of Fla. Stat. § 68.082(2)(a).

131.     Defendants knowingly created and used false records—specifically, false Quarterly Reports—to get the false claims described herein paid by the Florida Agency of Health Care Administration, in violation of Fla. Stat. § 68.082(2)(b).  Because the submission of accurate Quarterly Reports was a condition of payment under the Medicaid program, Defendants intended their misrepresentations to be relied upon by the Florida Agency of Health Care Administration in paying the claims described herein.

132.     The Quarterly Reports trigger invoices from the Florida Agency of Health Care Administration for the rebates owed for the Defendants' covered outpatient drugs.  The Rebate Agreement requires Defendants to make rebate payments for each calendar quarter within 30 days after receiving invoices from State Medicaid Agencies.  The Rebate Agreement requires each Defendant to make a rebate payment on all the Defendant's covered outpatient drugs for as long as an agreement with the Secretary of Health and Human Services is in force and invoices are received from State Medicaid Agencies, including the  Florida Agency of Health Care Administration.

133.     The rebates owed by Defendants during the life of the Rebate Agreement are

-27-

specific, legal obligations that Defendants have a statutory duty to pay.

134. Defendants knowingly created and used false records—specifically, false Quarterly Reports—to reduce rebates owed to the Florida Agency of Health Care Administration pursuant to the Medicaid Drug Rebate Program, in violation of Fla. Stat. § 68.082(2)(g).

135. As a consequence of Defendants' knowing submission of false Quarterly Reports, the State of Florida has not received the full rebates to which it was entitled pursuant to the Medicaid Drug Rebate Program.

## COUNT VI
## Violations of Tex. Hum. Res. Code Ann. § 36.002(12)

136. Relator realleges and incorporates by reference ¶¶ 1–135 as though fully set forth herein.

137. Defendants knowingly created and used false records to decrease their respective obligations to pay rebates to the Texas Health and Human Services Commission pursuant to the Medicaid Drug Rebate Program, in violation of Tex. Hum. Res. Code Ann. § 36.002(12).

138. Medicaid only pays for covered outpatient drugs manufactured by pharmaceutical manufacturers that have entered into a Medicaid Drug Rebate Agreement with the Secretary of Health and Human Services. Thus, as a condition of Medicaid reimbursement for their covered outpatient drugs, Defendants know that they must enter into and abide by the terms of the Rebate Agreement, including the submission of accurate Quarterly Reports.

139. Each Defendant has entered into a Rebate Agreement with the Secretary of Health and Human Services in order to authorize payment by State Medicaid Programs for its covered outpatient drugs, including the drugs identified herein.

-28-

140.    However, throughout the period described herein, Defendants violated the terms of their respective Rebate Agreements by falsely classifying their covered outpatient drugs for the purpose of reducing the rebates owed for those drugs under those agreements. Specifically, Defendants submitted Quarterly Reports using Form CMS-367 to CMS in which they falsely classified the covered outpatient drugs identified herein as noninnovator multiple source drugs, when in fact the drugs were innovators. Defendants knew their affirmative false representations regarding those drugs resulted in the creation and submission of false Quarterly Reports to CMS.

141.    Defendants transmitted false Quarterly Reports to CMS knowing that CMS would calculate rebate percentages for Defendants' covered outpatient drugs based upon the inaccurate representations made therein, and that CMS would transmit those rebate percentages to the Texas Health and Human Services Commission, the unit of government responsible for administering the Medicaid program in the State of Texas.

142.    Defendants acted knowingly.

143.    In reliance on Defendants' false representations, the Texas Health and Human Services Commission paid claims from pharmacies and other suppliers for the drugs identified herein. Because payment of the claims was conditioned upon Defendants' adherence to the requirements found in Rebate Agreement, and because the Defendants knowingly violated at least two of the provisions as described above, the claims were false.

144.    The Quarterly Reports trigger invoices from the Texas Health and Human Services Commission for the rebates owed for the Defendants' covered outpatient drugs. The Rebate Agreement requires Defendants to make rebate payments for each calendar quarter within 30 days after receiving invoices from State Medicaid Agencies. The Rebate Agreement requires each

-29-

Defendant to make a rebate payment on all the Defendant's covered outpatient drugs for as long

as an agreement with the Secretary of Health and Human Services is in force and invoices are

received from State Medicaid Agencies, including the Texas Health and Human Services

Commission.

145.    The rebates owed by Defendants during the life of the Rebate Agreement are

specific, legal obligations that Defendants have a statutory duty to pay.

146.    Defendants knowingly created and used false records—specifically, false

Quarterly Reports—to reduce rebates owed to the Texas Health and Human Services

Commission pursuant to the Medicaid Drug Rebate Program, in violation of Tex. Hum. Res.

Code Ann. § 36.002(12).

147.    As a consequence of Defendants' knowing submission of false Quarterly Reports,

the State of Texas has not received the full rebates to which it was entitled pursuant to the

Medicaid Drug Rebate Program.

**COUNT VII**
**Violations Del. Code. Ann.. tit. 6, § 1201(a)(1), (a)(2), and (a)(7)**

148.    Relator realleges and incorporates by reference  ¶¶ 1–147 as though fully set forth

herein.

149.    Defendants knowingly caused the presentation of false claims to the Delaware

Health and Social Services Agency, in violation of Del. Code. Ann. tit. 6, § 1201(a)(1); knowingly

created and used false records in order to get false claims paid by the Delaware Health and Social

Services Agency, in violation of Del. Code. Ann. tit. 6, § 1201(a)(2); and knowingly created and

used false records to decrease their respective obligations to pay rebates to the Delaware Health

-30-

and Social Services Agency pursuant to the Medicaid Drug Rebate Program, in violation of Del. Code. Ann. tit. 6, § 1201(a)(7).

150.     Medicaid only pays for covered outpatient drugs manufactured by pharmaceutical manufacturers that have entered into a Medicaid Drug Rebate Agreement with the Secretary of Health and Human Services.  Thus, as a condition of Medicaid reimbursement for their covered outpatient drugs, Defendants know that they must enter into and abide by the terms of the Rebate Agreement, including the submission of accurate Quarterly Reports.

151.     Each Defendant has entered into a Rebate Agreement with the Secretary of Health and Human Services in order to authorize payment by State Medicaid Programs for its covered outpatient drugs, including the drugs identified herein.

152.     However, throughout the period described herein, Defendants violated the terms of their respective Rebate Agreements by falsely classifying their covered outpatient drugs for the purpose of reducing the rebates owed for those drugs under those agreements.  Specifically, Defendants submitted Quarterly Reports using Form CMS-367 to CMS in which they falsely classified the covered outpatient drugs identified herein as noninnovator multiple source drugs, when in fact the drugs were innovators.  Defendants knew their affirmative false representations regarding those drugs resulted in the creation and submission of false Quarterly Reports to CMS.

153.     Defendants transmitted false Quarterly Reports to CMS knowing that CMS would calculate rebate percentages for Defendants' covered outpatient drugs based upon the inaccurate representations made therein, and that CMS would transmit those rebate percentages to the Delaware Health and Social Services Agency, the unit of government responsible for administering the Medicaid program in the State of Delaware.

154. The Delaware Health and Social Services Agency falls with the definition of "Government" found in Del. Code. Ann. tit. 6, § 1202(2).

155. Defendants acted knowingly.

156. In reliance on Defendants' false representations, the Delaware Health and Social Services Agency paid claims from pharmacies and other suppliers for the drugs identified herein. Because payment of the claims was conditioned upon Defendants' adherence to the requirements found in Rebate Agreement, and because the Defendants knowingly violated at least two of the provisions as described above, the claims were false.

157. Defendants knowingly caused pharmacies and other suppliers to present false claims for reimbursement for the drugs listed herein to the Delaware Health and Social Services Agency, in violation of Del. Code. Ann. tit. 6, § 1201(a)(1).

158. Defendants knowingly created and used false records—specifically, false Quarterly Reports—to get the false claims described herein paid by the Delaware Health and Social Services Agency, in violation of Del. Code. Ann. tit. 6, § 1201(a)(2). Because the submission of accurate Quarterly Reports was a condition of payment under the Medicaid program, Defendants intended their misrepresentations to be relied upon by the Delaware Health and Social Services Agency in paying the claims described herein.

159. The Quarterly Reports trigger invoices from the Delaware Health and Social Services Agency for the rebates owed for the Defendants' covered outpatient drugs. The Rebate Agreement requires Defendants to make rebate payments for each calendar quarter within 30 days after receiving invoices from State Medicaid Agencies. The Rebate Agreement requires each Defendant to make a rebate payment on all the Defendant's covered outpatient drugs for as long

as an agreement with the Secretary of Health and Human Services is in force and invoices are received from State Medicaid Agencies, including the Delaware Health and Social Services Agency.

160. The rebates owed by Defendants during the life of the Rebate Agreement are specific, legal obligations that Defendants have a statutory duty to pay.

161. Defendants knowingly created and used false records—specifically, false Quarterly Reports—to reduce rebates owed to the Delaware Health and Social Services Agency pursuant to the Medicaid Drug Rebate Program, in violation of Del. Code. Ann. tit. 6, § 1201(a)(7).

162. As a consequence of Defendants' knowing submission of false Quarterly Reports, the State of Delaware has not received the full rebates to which it was entitled pursuant to the Medicaid Drug Rebate Program.

## COUNT VIII
### Violations of Haw. Rev. Stat. § 661-21(a)(1), (a)(2), and (a)(7)

163. Relator realleges and incorporates by reference ¶¶ 1–162 as though fully set forth herein.

164. Defendants knowingly caused the presentation of false claims to the Hawaii Department of Human Services, in violation of Haw. Rev. Stat. § 661-21(a)(1); knowingly created and used false records in order to get false claims paid by the Hawaii Department of Human Services, in violation of Haw. Rev. Stat. § 661-21(a)(2); and knowingly created and used false records to decrease their respective obligations to pay rebates to the Hawaii Department of Human Services pursuant to the Medicaid Drug Rebate Program, in violation of Haw. Rev. Stat.

-33-

§ 661-21(a)(7).

165.    Medicaid only pays for covered outpatient drugs manufactured by pharmaceutical manufacturers that have entered into a Medicaid Drug Rebate Agreement with the Secretary of Health and Human Services.  Thus, as a condition of Medicaid reimbursement for their covered outpatient drugs, Defendants know that they must enter into and abide by the terms of the Rebate Agreement, including the submission of accurate Quarterly Reports.

166.    Each Defendant has entered into a Rebate Agreement with the Secretary of Health and Human Services in order to authorize payment by State Medicaid Programs for its covered outpatient drugs, including the drugs identified herein.

167.    However, throughout the period described herein, Defendants violated the terms of their respective Rebate Agreements by falsely classifying their covered outpatient drugs for the purpose of reducing the rebates owed for those drugs under those agreements.  Specifically, Defendants submitted Quarterly Reports using Form CMS-367 to CMS in which they falsely classified the covered outpatient drugs identified herein as noninnovator multiple source drugs, when in fact the drugs were innovators.  Defendants knew their affirmative false representations regarding those drugs resulted in the creation and submission of false Quarterly Reports to CMS.

168.    Defendants transmitted false Quarterly Reports to CMS knowing that CMS would calculate rebate percentages for Defendants' covered outpatient drugs based upon the inaccurate representations made therein, and that CMS would transmit those rebate percentages to the Hawaii Department of Human Services, the unit of government responsible for administering the Medicaid program in the State of Hawaii.

169.    Defendants acted knowingly.

170.     In reliance on Defendants' false representations, the Hawaii Department of Human Services paid claims from pharmacies and other suppliers for the drugs identified herein.  Because payment of the claims was conditioned upon Defendants' adherence to the requirements found in Rebate Agreement, and because the Defendants knowingly violated at least two of the provisions as described above, the claims were false.

171.     Defendants knowingly caused pharmacies and other suppliers to present false claims for reimbursement for the drugs listed herein to the Hawaii Department of Human Services, in violation of Haw. Rev. Stat. § 661-21(a)(1).

172.     Defendants knowingly created and used false records—specifically, false Quarterly Reports—to get the false claims described herein paid by the Hawaii Department of Human Services, in violation of Haw. Rev. Stat. § 661-21(a)(2).  Because the submission of accurate Quarterly Reports was a condition of payment under the Medicaid program, Defendants intended their misrepresentations to be relied upon by the Hawaii Department of Human Services in paying the claims described herein.

173.     The Quarterly Reports trigger invoices from the Hawaii Department of Human Services for the rebates owed for the Defendants' covered outpatient drugs.  The Rebate Agreement requires Defendants to make rebate payments for each calendar quarter within 30 days after receiving invoices from State Medicaid Agencies.  The Rebate Agreement requires each Defendant to make a rebate payment on all the Defendant's covered outpatient drugs for as long as an agreement with the Secretary of Health and Human Services is in force and invoices are received from State Medicaid Agencies, including the Hawaii Department of Human Services.

174.     The rebates owed by Defendants during the life of the Rebate Agreement are

specific, legal obligations that Defendants have a statutory duty to pay.

175.    Defendants knowingly created and used false records—specifically, false Quarterly Reports—to reduce rebates owed to the Hawaii Department of Human Services pursuant to the Medicaid Drug Rebate Program, in violation of Haw. Rev. Stat. § 661-21(a)(7).

176.    As a consequence of Defendants' knowing submission of false Quarterly Reports, the State of Hawaii has not received the full rebates to which it was entitled pursuant to the Medicaid Drug Rebate Program.

### COUNT IX
### Violations of Ind. Code § 5-11-5.5-2(b)(1), (b)(2), and (b)(6)

177.    Relator realleges and incorporates by reference ¶¶ 1–176 as though fully set forth herein.

178.    Defendants knowingly caused the presentation of false claims to the Indiana Office of Medicaid Policy and Planning, in violation of Ind. Code § 5-11-5.5-2(b)(1); knowingly created and used false records in order to get false claims paid by the Indiana Office of Medicaid Policy and Planning, in violation of Ind. Code § 5-11-5.5-2(b)(2); and knowingly created and used false records to decrease their respective obligations to pay rebates to the Indiana Office of Medicaid Policy and Planning pursuant to the Medicaid Drug Rebate Program, in violation of Ind. Code § 5-11-5.5-2(b)(6).

179.    Medicaid only pays for covered outpatient drugs manufactured by pharmaceutical manufacturers that have entered into a Medicaid Drug Rebate Agreement with the Secretary of Health and Human Services.  Thus, as a condition of Medicaid reimbursement for their covered outpatient drugs, Defendants know that they must enter into and abide by the terms of the Rebate

Agreement, including the submission of accurate Quarterly Reports.

180.    Each Defendant has entered into a Rebate Agreement with the Secretary of Health and Human Services in order to authorize payment by State Medicaid Programs for its covered outpatient drugs, including the drugs identified herein.

181.    However, throughout the period described herein, Defendants violated the terms of their respective Rebate Agreements by falsely classifying their covered outpatient drugs for the purpose of reducing the rebates owed for those drugs under those agreements.  Specifically, Defendants submitted Quarterly Reports using Form CMS-367 to CMS in which they falsely classified the covered outpatient drugs identified herein as noninnovator multiple source drugs, when in fact the drugs were innovators.  Defendants knew their affirmative false representations regarding those drugs resulted in the creation and submission of false Quarterly Reports to CMS.

182.    Defendants transmitted false Quarterly Reports to CMS knowing that CMS would calculate rebate percentages for Defendants' covered outpatient drugs based upon the inaccurate representations made therein, and that CMS would transmit those rebate percentages to the Indiana Office of Medicaid Policy and Planning, the unit of government responsible for administering the Medicaid program in the State of Indiana.

183.    The Indiana Office of Medicaid Policy and Planning  falls with the definition of "state" found in Ind. Code § 5-11-5.5-1(7).

184.    Defendants acted knowingly.

185.    In reliance on Defendants' false representations, the Indiana Office of Medicaid Policy and Planning paid claims from pharmacies and other suppliers for the drugs identified herein.  Because payment of the claims was conditioned upon Defendants' adherence to the

requirements found in Rebate Agreement, and because the Defendants knowingly violated at least

two of the provisions as described above, the claims were false.

186.    Defendants knowingly caused pharmacies and other suppliers to present false

claims for reimbursement for the drugs listed herein to the Indiana Office of Medicaid Policy and

Planning, in violation of Ind. Code § 5-11-5.5-2(b)(1).

187.    Defendants knowingly created and used false records—specifically, false

Quarterly Reports—to get the false claims described herein paid by the Indiana Office of Medicaid

Policy and Planning, in violation of Ind. Code § 5-11-5.5-2(b)(2).  Because the submission of

accurate Quarterly Reports was a condition of payment under the Medicaid program, Defendants

intended their misrepresentations to be relied upon by the Indiana Office of Medicaid Policy and

Planning in paying the claims described herein.

188.    The Quarterly Reports trigger invoices from the Indiana Office of Medicaid Policy

and Planning for the rebates owed for the Defendants' covered outpatient drugs.  The Rebate

Agreement requires Defendants to make rebate payments for each calendar quarter within 30 days

after receiving invoices from State Medicaid Agencies.  The Rebate Agreement requires each

Defendant to make a rebate payment on all the Defendant's covered outpatient drugs for as long

as an agreement with the Secretary of Health and Human Services is in force and invoices are

received from State Medicaid Agencies, including the Indiana Office of Medicaid Policy and

Planning.

189.    The rebates owed by Defendants during the life of the Rebate Agreement are

specific, legal obligations that Defendants have a statutory duty to pay.

190.    Defendants knowingly created and used false records—specifically, false

Quarterly Reports—to reduce rebates owed to the Indiana Office of Medicaid Policy and Planning pursuant to the Medicaid Drug Rebate Program, in violation of Ind. Code § 5-11-5.5-2(b)(6).

191.   As a consequence of Defendants' knowing submission of false Quarterly Reports, the State of Indiana has not received the full rebates to which it was entitled pursuant to the Medicaid Drug Rebate Program.

## COUNT X
## Violations of La. Rev. Stat. Ann. § 46:438.3(A) and (C)

192.   Relator realleges and incorporates by reference ¶¶ 1–191 as though fully set forth herein.

193.   Defendants knowingly caused the presentation of false claims to the Louisiana Department of Health & Hospitals, in violation of La. Rev. Stat. Ann. § 46:438.3(A); and knowingly created and used false records to decrease their respective obligations to pay rebates to the Louisiana Department of Health & Hospitals pursuant to the Medicaid Drug Rebate Program, in violation of La. Rev. Stat. Ann. § 46:438.3(C).

194.   Medicaid only pays for covered outpatient drugs manufactured by pharmaceutical manufacturers that have entered into a Medicaid Drug Rebate Agreement with the Secretary of Health and Human Services.  Thus, as a condition of Medicaid reimbursement for their covered outpatient drugs, Defendants know that they must enter into and abide by the terms of the Rebate Agreement, including the submission of accurate Quarterly Reports.

195.   Each Defendant has entered into a Rebate Agreement with the Secretary of Health and Human Services in order to authorize payment by State Medicaid Programs for its covered outpatient drugs, including the drugs identified herein.

196.    However, throughout the period described herein, Defendants violated the terms of their respective Rebate Agreements by falsely classifying their covered outpatient drugs for the purpose of reducing the rebates owed for those drugs under those agreements.  Specifically, Defendants submitted Quarterly Reports using Form CMS-367 to CMS in which they falsely classified the covered outpatient drugs identified herein as noninnovator multiple source drugs, when in fact the drugs were innovators.  Defendants knew their affirmative false representations regarding those drugs resulted in the creation and submission of false Quarterly Reports to CMS.

197.    Defendants transmitted false Quarterly Reports to CMS knowing that CMS would calculate rebate percentages for Defendants' covered outpatient drugs based upon the inaccurate representations made therein, and that CMS would transmit those rebate percentages to the Louisiana Department of Health & Hospitals, the unit of government responsible for administering the Medicaid program in the State of Louisiana.

198.    Defendants acted knowingly.

199.    In reliance on Defendants' false representations, the Louisiana Department of Health & Hospitals paid claims from pharmacies and other suppliers for the drugs identified herein.  Because payment of the claims was conditioned upon Defendants' adherence to the requirements found in Rebate Agreement, and because the Defendants knowingly violated at least two of the provisions as described above, the claims were false.

200.    Defendants knowingly caused pharmacies and other suppliers to present false claims for reimbursement for the drugs listed herein to the Louisiana Department of Health & Hospitals, in violation of La. Rev. Stat. Ann. § 46:438.3(A).

201.    The Quarterly Reports trigger invoices from the Indiana Office of Medicaid Policy

and Planning for the rebates owed for the Defendants' covered outpatient drugs. The Rebate Agreement requires Defendants to make rebate payments for each calendar quarter within 30 days after receiving invoices from State Medicaid Agencies. The Rebate Agreement requires each Defendant to make a rebate payment on all the Defendant's covered outpatient drugs for as long as an agreement with the Secretary of Health and Human Services is in force and invoices are received from State Medicaid Agencies, including the Louisiana Department of Health & Hospitals.

202. The rebates owed by Defendants during the life of the Rebate Agreement are specific, legal obligations that Defendants have a statutory duty to pay.

203. Defendants knowingly created and used false records—specifically, false Quarterly Reports—to reduce rebates owed to the Louisiana Department of Health & Hospitals pursuant to the Medicaid Drug Rebate Program, in violation of La. Rev. Stat. Ann. § 46:438.3(C).

204. As a consequence of Defendants' knowing submission of false Quarterly Reports, the State of Louisiana has not received the full rebates to which it was entitled pursuant to the Medicaid Drug Rebate Program.

## COUNT XI
### Violations of N.H. Rev. Stat. Ann. § 167:61-b(I)(a), (I)(b), and (I)(e)

205. Relator realleges and incorporates by reference ¶¶ 1–204 as though fully set forth herein.

206. Defendants knowingly caused the presentation of false claims to the New Hampshire Department of Health and Human Services, in violation of N.H. Rev. Stat. Ann.

§ 167:61-b(I)(a); knowingly created and used false records in order to get false claims paid by the New Hampshire Department of Health and Human Services, in violation of N.H. Rev. Stat. Ann. § 167:61-b(I)(b); and knowingly created and used false records to decrease their respective obligations to pay rebates to the New Hampshire Department of Health and Human Services pursuant to the Medicaid Drug Rebate Program, in violation of N.H. Rev. Stat. Ann. § 167:61-b(I)(e).

207.     Medicaid only pays for covered outpatient drugs manufactured by pharmaceutical manufacturers that have entered into a Medicaid Drug Rebate Agreement with the Secretary of Health and Human Services.  Thus, as a condition of Medicaid reimbursement for their covered outpatient drugs, Defendants know that they must enter into and abide by the terms of the Rebate Agreement, including the submission of accurate Quarterly Reports.

208.     Each Defendant has entered into a Rebate Agreement with the Secretary of Health and Human Services in order to authorize payment by State Medicaid Programs for its covered outpatient drugs, including the drugs identified herein.

209.     However, throughout the period described herein, Defendants violated the terms of their respective Rebate Agreements by falsely classifying their covered outpatient drugs for the purpose of reducing the rebates owed for those drugs under those agreements.  Specifically, Defendants submitted Quarterly Reports using Form CMS-367 to CMS in which they falsely classified the covered outpatient drugs identified herein as noninnovator multiple source drugs, when in fact the drugs were innovators.  Defendants knew their affirmative false representations regarding those drugs resulted in the creation and submission of false Quarterly Reports to CMS.

210.     Defendants transmitted false Quarterly Reports to CMS knowing that CMS would

-42-

calculate rebate percentages for Defendants' covered outpatient drugs based upon the inaccurate representations made therein, and that CMS would transmit those rebate percentages to the New Hampshire Department of Health and Human Services, the unit of government responsible for administering the Medicaid program in the State of New Hampshire.

211.     As used in N.H. Rev. Stat. Ann. § 167:61-b(I)(e), the term "department" refers to the New Hampshire Department of Health and Human Services.  N.H. Rev. Stat. Ann. § 167:58(III).

212.     Defendants acted knowingly.

213.     In reliance on Defendants' false representations, the New Hampshire Department of Health and Human Services paid claims from pharmacies and other suppliers for the drugs identified herein.  Because payment of the claims was conditioned upon Defendants' adherence to the requirements found in Rebate Agreement, and because the Defendants knowingly violated at least two of the provisions as described above, the claims were false.

214.     Defendants knowingly caused pharmacies and other suppliers to present false claims for reimbursement for the drugs listed herein to the New Hampshire Department of Health and Human Services, in violation of N.H. Rev. Stat. Ann. § 167:61-b(I)(a).

215.     Defendants knowingly created and used false records—specifically, false Quarterly Reports—to get the false claims described herein paid by the New Hampshire Department of Health and Human Services, in violation of N.H. Rev. Stat. Ann. § 167:61-b(I)(b). Because the submission of accurate Quarterly Reports was a condition of payment under the Medicaid program, Defendants intended their misrepresentations to be relied upon by the New Hampshire Department of Health and Human Services in paying the claims described herein.

-43-

216.     The Quarterly Reports trigger invoices from the New Hampshire Department of Health and Human Services for the rebates owed for the Defendants' covered outpatient drugs. The Rebate Agreement requires Defendants to make rebate payments for each calendar quarter within 30 days after receiving invoices from State Medicaid Agencies.  The Rebate Agreement requires each Defendant to make a rebate payment on all the Defendant's covered outpatient drugs for as long as an agreement with the Secretary of Health and Human Services is in force and invoices are received from State Medicaid Agencies, including the New Hampshire Department of Health and Human Services.

217.     The rebates owed by Defendants during the life of the Rebate Agreement are specific, legal obligations that Defendants have a statutory duty.

218.     Defendants knowingly created and used false records—specifically, false Quarterly Reports—to reduce rebates owed to the New Hampshire Department of Health and Human Services pursuant to the Medicaid Drug Rebate Program, in violation of N.H. Rev. Stat. Ann. § 167:61-b(I)(e).

219.     As a consequence of Defendants' knowing submission of false Quarterly Reports, the State of New Hampshire has not received the full rebates to which it was entitled pursuant to the Medicaid Drug Rebate Program.

## COUNT XII
### Violations of Nev. Rev. Stat. 357.040(1)(a), (1)(b), and (1)(g)

220.     Relator realleges and incorporates by reference  ¶¶ 1–219 as though fully set forth herein.

221.     Defendants knowingly caused the presentation of false claims to the Nevada

-44-

Division of Health Care Financing and Policy, in violation of Nev. Rev. Stat. 357.040(1)(a);
knowingly created and used false records in order to get false claims paid by the Nevada Division
of Health Care Financing and Policy, in violation of Nev. Rev. Stat. 357.040 (1)(b); and
knowingly created and used false records to decrease their respective obligations to pay rebates to
the Nevada Division of Health Care Financing and Policy pursuant to the Medicaid Drug Rebate
Program, in violation of Nev. Rev. Stat. 357.040(1)(g).

222.    Medicaid only pays for covered outpatient drugs manufactured by pharmaceutical
manufacturers that have entered into a Medicaid Drug Rebate Agreement with the Secretary of
Health and Human Services.  Thus, as a condition of Medicaid reimbursement for their covered
outpatient drugs, Defendants know that they must enter into and abide by the terms of the Rebate
Agreement, including the submission of accurate Quarterly Reports.

223.    Each Defendant has entered into a Rebate Agreement with the Secretary of Health
and Human Services in order to authorize payment by State Medicaid Programs for its covered
outpatient drugs, including the drugs identified herein.

224.    However, throughout the period described herein, Defendants violated the terms
of their respective Rebate Agreements by falsely classifying their covered outpatient drugs for the
purpose of reducing the rebates owed for those drugs under those agreements.  Specifically,
Defendants submitted Quarterly Reports using Form CMS-367 to CMS in which they falsely
classified the covered outpatient drugs identified herein as noninnovator multiple source drugs,
when in fact the drugs were innovators.  Defendants knew their affirmative false representations
regarding those drugs resulted in the creation and submission of false Quarterly Reports to CMS.

225.    Defendants transmitted false Quarterly Reports to CMS knowing that CMS would

calculate rebate percentages for Defendants' covered outpatient drugs based upon the inaccurate

representations made therein, and that CMS would transmit those rebate percentages to the

Nevada Division of Health Care Financing and Policy, the unit of government responsible for

administering the Medicaid program in the State of Nevada.

226.     Defendants acted knowingly as that term is defined in Nev. Rev. Stat. 357.040(2).

227.     In reliance on Defendants' false representations, the Nevada Division of Health

Care Financing and Policy paid claims from pharmacies and other suppliers for the drugs

identified herein.  Because payment of the claims was conditioned upon Defendants' adherence to

the requirements found in Rebate Agreement, and because the Defendants knowingly violated at

least two of the provisions as described above, the claims were false.

228.     Defendants knowingly caused pharmacies and other suppliers to present false

claims for reimbursement for the drugs listed herein to the Nevada Division of Health Care

Financing and Policy, in violation of Nev. Rev. Stat. 357.040(1)(a).

229.     Defendants knowingly created and used false records—specifically, false

Quarterly Reports—to get the false claims described herein paid by the Nevada Division of Health

Care Financing and Policy, in violation of Nev. Rev. Stat. 357.040(1)(b).  Because the submission

of accurate Quarterly Reports was a condition of payment under the Medicaid program,

Defendants intended their misrepresentations to be relied upon by the Nevada Division of Health

Care Financing and Policy in paying the claims described herein.

230.     The Quarterly Reports trigger invoices from the Nevada Division of Health Care

Financing and Policy for the rebates owed for the Defendants' covered outpatient drugs.  The

Rebate Agreement requires Defendants to make rebate payments for each calendar quarter within

30 days after receiving invoices from State Medicaid Agencies. The Rebate Agreement requires each Defendant to make a rebate payment on all the Defendant's covered outpatient drugs for as long as an agreement with the Secretary of Health and Human Services is in force and invoices are received from State Medicaid Agencies, including the Nevada Division of Health Care Financing and Policy.

231.     The rebates owed by Defendants during the life of the Rebate Agreement are specific, legal obligations that Defendants have a statutory duty to pay.

232.     Defendants knowingly created and used false records—specifically, false Quarterly Reports—to reduce rebates owed to the Nevada Division of Health Care Financing and Policy pursuant to the Medicaid Drug Rebate Program, in violation of Nev. Rev. Stat. 357.040(1)(g).

233.     As a consequence of Defendants' knowing submission of false Quarterly Reports, the State of Nevada has not received the full rebates to which it was entitled pursuant to the Medicaid Drug Rebate Program.

## COUNT XIII

### Violations of Tenn. Code Ann. § 71-5-182(a)(1)(A), (a)(1)(B), and (a)(1)(D)

234.     Relator realleges and incorporates by reference ¶¶ 1–233 as though fully set forth herein.

235.     Defendants knowingly caused the presentation of false claims to the Bureau of TennCare, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(A); knowingly created and used false records in order to get false claims paid by the Bureau of TennCare, in violation of Tenn. Code Ann. § 71-5-182 (a)(1)(B); and knowingly created and used false records to decrease their

respective obligations to pay rebates to the Bureau of TennCare pursuant to the Medicaid Drug Rebate Program, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(D).

236.    Medicaid only pays for covered outpatient drugs manufactured by pharmaceutical manufacturers that have entered into a Medicaid Drug Rebate Agreement with the Secretary of Health and Human Services.  Thus, as a condition of Medicaid reimbursement for their covered outpatient drugs, Defendants know that they must enter into and abide by the terms of the Rebate Agreement, including the submission of accurate Quarterly Reports.

237.    Each Defendant has entered into a Rebate Agreement with the Secretary of Health and Human Services in order to authorize payment by State Medicaid Programs for its covered outpatient drugs, including the drugs identified herein.

238.    However, throughout the period described herein, Defendants violated the terms of their respective Rebate Agreements by falsely classifying their covered outpatient drugs for the purpose of reducing the rebates owed for those drugs under those agreements.  Specifically, Defendants submitted Quarterly Reports using Form CMS-367 to CMS in which they falsely classified the covered outpatient drugs identified herein as noninnovator multiple source drugs, when in fact the drugs were innovators.  Defendants knew their affirmative false representations regarding those drugs resulted in the creation and submission of false Quarterly Reports to CMS.

239.    Defendants transmitted false Quarterly Reports to CMS knowing that CMS would calculate rebate percentages for Defendants' covered outpatient drugs based upon the inaccurate representations made therein, and that CMS would transmit those rebate percentages to the Bureau of TennCare, the unit of government responsible for administering the Medicaid program in the State of Tennessee.

240.    Defendants acted knowingly as that term is defined in Tenn. Code Ann. § 71-5-182(b).

241.    In reliance on Defendants' false representations, the Bureau of TennCare paid claims from pharmacies and other suppliers for the drugs identified herein.  Because payment of the claims was conditioned upon Defendants' adherence to the requirements found in Rebate Agreement, and because the Defendants knowingly violated at least two of the provisions as described above, the claims were false.

242.    Defendants knowingly caused pharmacies and other suppliers to present false claims for reimbursement for the drugs listed herein to the Bureau of TennCare, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(A).

243.    Defendants knowingly created and used false records—specifically, false Quarterly Reports—to get the false claims described herein paid by the Bureau of TennCare, in violation of Tenn. Code Ann. § 71-5-182 (a)(1)(B).  Because the submission of accurate Quarterly Reports was a condition of payment under the Medicaid program, Defendants intended their misrepresentations to be relied upon by the Bureau of TennCare in paying the claims described herein.

244.    The Quarterly Reports trigger invoices from the Bureau of TennCare for the rebates owed for the Defendants' covered outpatient drugs.  The Rebate Agreement requires Defendants to make rebate payments for each calendar quarter within 30 days after receiving invoices from State Medicaid Agencies.  The Rebate Agreement requires each Defendant to make a rebate payment on all the Defendant's covered outpatient drugs for as long as an agreement with the Secretary of Health and Human Services is in force and invoices are received from State

Medicaid Agencies, including the Bureau of TennCare.

245.    The rebates owed by Defendants during the life of the Rebate Agreement are specific, legal obligations that Defendants have a statutory duty to pay.

246.    Defendants knowingly created and used false records—specifically, false Quarterly Reports—to reduce rebates owed to the Bureau of TennCare pursuant to the Medicaid Drug Rebate Program, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(D).

247.    As a consequence of Defendants' knowing submission of false Quarterly Reports, the State of Tennessee has not received the full rebates to which it was entitled pursuant to the Medicaid Drug Rebate Program.

## COUNT XIV
### Violations of Mich. Comp. Laws § 400.607(1) and (3)

248.    Relator realleges and incorporates by reference ¶¶ 1–247 as though fully set forth herein.

249.    Defendants knowingly caused the presentation of false claims to the Michigan Department of Community Services, in violation of Mich. Comp. Laws § 400.607(1); and knowingly created and used false records to decrease their respective obligations to pay rebates to the Michigan Department of Community Services pursuant to the Medicaid Drug Rebate Program, in violation of Mich. Comp. Laws § 400.607(3).

250.    Medicaid only pays for covered outpatient drugs manufactured by pharmaceutical manufacturers that have entered into a Medicaid Drug Rebate Agreement with the Secretary of Health and Human Services.  Thus, as a condition of Medicaid reimbursement for their covered

outpatient drugs, Defendants know that they must enter into and abide by the terms of the Rebate Agreement, including the submission of accurate Quarterly Reports.

251.    Each Defendant has entered into a Rebate Agreement with the Secretary of Health and Human Services in order to authorize payment by State Medicaid Programs for its covered outpatient drugs, including the drugs identified herein.

252.    However, throughout the period described herein, Defendants violated the terms of their respective Rebate Agreements by falsely classifying their covered outpatient drugs for the purpose of reducing the rebates owed for those drugs under those agreements.  Specifically, Defendants submitted Quarterly Reports using Form CMS-367 to CMS in which they falsely classified the covered outpatient drugs identified herein as noninnovator multiple source drugs, when in fact the drugs were innovators.  Defendants knew their affirmative false representations regarding those drugs resulted in the creation and submission of false Quarterly Reports to CMS.

253.    Defendants transmitted false Quarterly Reports to CMS knowing that CMS would calculate rebate percentages for Defendants' covered outpatient drugs based upon the inaccurate representations made therein, and that CMS would transmit those rebate percentages to the Michigan Department of Community Services, the unit of government responsible for administering the Medicaid program in the State of Michigan.

254.    Defendants acted knowingly as that term is defined in Mich. Comp. Laws § 400.602(f).

255.    In reliance on Defendants' false representations, the Michigan Department of Community Services paid claims from pharmacies and other suppliers for the drugs identified herein.  Because payment of the claims was conditioned upon Defendants' adherence to the

-51-

requirements found in Rebate Agreement, and because the Defendants knowingly violated at least

two of the provisions as described above, the claims were false.

256.    Defendants knowingly caused pharmacies and other suppliers to present false

claims for reimbursement for the drugs listed herein to the Michigan Department of Community

Services, in violation of Mich. Comp. Laws § 400.607(1).

257.    The Quarterly Reports trigger invoices from the Michigan Department of

Community Services for the rebates owed for the Defendants' covered outpatient drugs.  The

Rebate Agreement requires Defendants to make rebate payments for each calendar quarter within

30 days after receiving invoices from State Medicaid Agencies.  The Rebate Agreement requires

each Defendant to make a rebate payment on all the Defendant's covered outpatient drugs for as

long as an agreement with the Secretary of Health and Human Services is in force and invoices

are received from State Medicaid Agencies, including the Michigan Department of Community

Services.

258.    The rebates owed by Defendants during the life of the Rebate Agreement are

specific, legal obligations that Defendants have a statutory duty to pay.

259.    Defendants knowingly created and used false records—specifically, false

Quarterly Reports—to reduce rebates owed to the Michigan Department of Community Services

pursuant to the Medicaid Drug Rebate Program, in violation of Mich. Comp. Laws § 400.607(3).

260.    As a consequence of Defendants' knowing submission of false Quarterly Reports,

the State of Michigan has not received the full rebates to which it was entitled pursuant to the

Medicaid Drug Rebate Program.

**COUNT XV**

## Violations of N.M. Stat. Ann. § 44-9-3(A)(1), (A)(2), and (A)(3)

261.     Relator realleges and incorporates by reference ¶¶ 1–260 as though fully set forth herein.

262.     Defendants knowingly caused the presentation of false claims to the New Mexico Human Services Department, in violation of N.M. Stat. Ann. § 44-9-3(A)(1); knowingly created and used false records in order to get false claims paid by the New Mexico Human Services Department, in violation of N.M. Stat. Ann. § 44-9-3(A)(2); and knowingly created and used false records to decrease their respective obligations to pay rebates to the New Mexico Human Services Department pursuant to the Medicaid Drug Rebate Program, in violation of N.M. Stat. Ann. § 44-9-3(A)(3).

263.     Medicaid only pays for covered outpatient drugs manufactured by pharmaceutical manufacturers that have entered into a Medicaid Drug Rebate Agreement with the Secretary of Health and Human Services.  Thus, as a condition of Medicaid reimbursement for their covered outpatient drugs, Defendants know that they must enter into and abide by the terms of the Rebate Agreement, including the submission of accurate Quarterly Reports.

264.     Each Defendant has entered into a Rebate Agreement with the Secretary of Health and Human Services in order to authorize payment by State Medicaid Programs for its covered outpatient drugs, including the drugs identified herein.

265.     However, throughout the period described herein, Defendants violated the terms of their respective Rebate Agreements by falsely classifying their covered outpatient drugs for the purpose of reducing the rebates owed for those drugs under those agreements.  Specifically, Defendants submitted Quarterly Reports using Form CMS-367 to CMS in which they falsely

classified the covered outpatient drugs identified herein as noninnovator multiple source drugs, when in fact the drugs were innovators. Defendants knew their affirmative false representations regarding those drugs resulted in the creation and submission of false Quarterly Reports to CMS.

266. Defendants transmitted false Quarterly Reports to CMS knowing that CMS would calculate rebate percentages for Defendants' covered outpatient drugs based upon the inaccurate representations made therein, and that CMS would transmit those rebate percentages to the New Mexico Human Services Department, the unit of government responsible for administering the Medicaid program in the State of New Mexico..

267. The New Mexico Human Services Department falls with the definition of "state" found in N.M. Stat. Ann. § 44-9-2(E).

268. Defendants acted knowingly as that term is defined in N.M. Stat. Ann. § 44-9-2©).

269. In reliance on Defendants' false representations, the New Mexico Human Services Department paid claims from pharmacies and other suppliers for the drugs identified herein. Because payment of the claims was conditioned upon Defendants' adherence to the requirements found in Rebate Agreement, and because the Defendants knowingly violated at least two of the provisions as described above, the claims were false.

270. Defendants knowingly caused pharmacies and other suppliers to present false claims for reimbursement for the drugs listed herein to the New Mexico Human Services Department, in violation of N.M. Stat. Ann. § 44-9-3(A)(1).

271. Defendants knowingly created and used false records—specifically, false Quarterly Reports—to get the false claims described herein paid by the New Mexico Human Services Department, in violation of N.M. Stat. Ann. § 44-9-3A)(2). Because the submission of

accurate Quarterly Reports was a condition of payment under the Medicaid program, Defendants intended their misrepresentations to be relied upon by the New Mexico Human Services Department in paying the claims described herein.

272.    The Quarterly Reports trigger invoices from the New Mexico Human Services Department for the rebates owed for the Defendants' covered outpatient drugs.  The Rebate Agreement requires Defendants to make rebate payments for each calendar quarter within 30 days after receiving invoices from State Medicaid Agencies.  The Rebate Agreement requires each Defendant to make a rebate payment on all the Defendant's covered outpatient drugs for as long as an agreement with the Secretary of Health and Human Services is in force and invoices are received from State Medicaid Agencies, including the New Mexico Human Services Department.


273.    The rebates owed by Defendants during the life of the Rebate Agreement are specific, legal obligations that Defendants have a statutory duty to pay.

274.    Defendants knowingly created and used false records—specifically, false Quarterly Reports—to reduce rebates owed to the New Mexico Human Services Department pursuant to the Medicaid Drug Rebate Program, in violation of N.M. Stat. Ann. § 44-9-3(A)(3).

275.    As a consequence of Defendants' knowing submission of false Quarterly Reports, the State of New Mexico has not received the full rebates to which it was entitled pursuant to Medicaid Drug Rebate Program.

## COUNT XVI
### Violations of N.Y. State Fin. Law § 189(1)(a), (1)(b), and (1)(g)

276.    Relator realleges and incorporates by reference ¶¶ 1–275 as though fully set forth

herein.

277.     Defendants knowingly caused the presentation of false claims to the New York Department of Health, in violation of N.Y. State Fin. Law § 189(1)(a); knowingly created and used false records in order to get false claims paid by the New York Department of Health, in violation of N.Y. State Fin. Law § 189(1)(b); and knowingly created and used false records to decrease their respective obligations to pay rebates to the New York Department of Health pursuant to the Medicaid Drug Rebate Program, in violation of N.Y. State Fin. Law § 189(1)(g).

278.     Medicaid only pays for covered outpatient drugs manufactured by pharmaceutical manufacturers that have entered into a Medicaid Drug Rebate Agreement with the Secretary of Health and Human Services.  Thus, as a condition of Medicaid reimbursement for their covered outpatient drugs, Defendants know that they must enter into and abide by the terms of the Rebate Agreement, including the submission of accurate Quarterly Reports.

279.     Each Defendant has entered into a Rebate Agreement with the Secretary of Health and Human Services in order to authorize payment by State Medicaid Programs for its covered outpatient drugs, including the drugs identified herein.

280.     However, throughout the period described herein, Defendants violated the terms of their respective Rebate Agreements by falsely classifying their covered outpatient drugs for the purpose of reducing the rebates owed for those drugs under those agreements.  Specifically, Defendants submitted Quarterly Reports using Form CMS-367 to CMS in which they falsely classified the covered outpatient drugs identified herein as noninnovator multiple source drugs, when in fact the drugs were innovators.  Defendants knew their affirmative false representations regarding those drugs resulted in the creation and submission of false Quarterly Reports to CMS.

-56-

281.    Defendants transmitted false Quarterly Reports to CMS knowing that CMS would calculate rebate percentages for Defendants' covered outpatient drugs based upon the inaccurate representations made therein, and that CMS would transmit those rebate percentages to the New York Department of Health, the unit of government responsible for administering the Medicaid program in the State of New York.

282.    The New York Department of Health falls with the definition of "state" found in N.Y. State Fin. Law § 188(7).

283.    Defendants acted knowingly as that term is defined in N.Y. State Fin. Law § 188(3).

284.    In reliance on Defendants' false representations, the New York Department of Health paid claims from pharmacies and other suppliers for the drugs identified herein.  Because payment of the claims was conditioned upon Defendants' adherence to the requirements found in Rebate Agreement, and because the Defendants knowingly violated at least two of the provisions as described above, the claims were false.

285.    Defendants knowingly caused pharmacies and other suppliers to present false claims for reimbursement for the drugs listed herein to the New York Department of Health, in violation of N.Y. State Fin. Law § 189(1)(a).

286.    Defendants knowingly created and used false records—specifically, false Quarterly Reports—to get the false claims described herein paid by the New York Department of Health, in violation of N.Y. State Fin. Law § 189(1)(b).  Because the submission of accurate Quarterly Reports was a condition of payment under the Medicaid program, Defendants intended their misrepresentations to be relied upon by the New York Department of Health in paying the

-57-

claims described herein.

287.    The Quarterly Reports trigger invoices from the New York Department of Health for the rebates owed for the Defendants' covered outpatient drugs.  The Rebate Agreement requires Defendants to make rebate payments for each calendar quarter within 30 days after receiving invoices from State Medicaid Agencies.  The Rebate Agreement requires each Defendant to make a rebate payment on all the Defendant's covered outpatient drugs for as long as an agreement with the Secretary of Health and Human Services is in force and invoices are received from State Medicaid Agencies, including the New York Department of Health.

288.    The rebates owed by Defendants during the life of the Rebate Agreement are specific, legal obligations that Defendants have a statutory duty to pay.

289.    Defendants knowingly created and used false records—specifically, false Quarterly Reports—to reduce rebates owed to the New York Department of Health pursuant to the Medicaid Drug Rebate Program, in violation of N.Y. State Fin. Law § 189(1)(g).

290.    As a consequence of Defendants' knowing submission of false Quarterly Reports, the State of New York has not received the full rebates to which it was entitled pursuant to the Medicaid Drug Rebate Program.

## COUNT XVII
### Violations of Mass. Gen. Laws. ch. 12, § 5B(1), (2), and (8)

291.    Relator realleges and incorporates by reference  ¶¶ 1–290 as though fully set forth herein.

292.    Defendants knowingly caused the presentation of false claims to the Massachusetts Office of Health and Human Services, in violation of Mass. Gen. Laws. ch. 12, § 5B(1);

-58-

knowingly created and used false records in order to get false claims paid by the Massachusetts Office of Health and Human Services, in violation of Mass. Gen. Laws. ch. 12, § 5B(2); and knowingly created and used false records to decrease their respective obligations to pay rebates to the Massachusetts Office of Health and Human Services pursuant to the Medicaid Drug Rebate Program, in violation of Mass. Gen. Laws. ch. 12, § 5B(8).

293.    Medicaid only pays for covered outpatient drugs manufactured by pharmaceutical manufacturers that have entered into a Medicaid Drug Rebate Agreement with the Secretary of Health and Human Services.  Thus, as a condition of Medicaid reimbursement for their covered outpatient drugs, Defendants know that they must enter into and abide by the terms of the Rebate Agreement, including the submission of accurate Quarterly Reports.

294.    Each Defendant has entered into a Rebate Agreement with the Secretary of Health and Human Services in order to authorize payment by State Medicaid Programs for its covered outpatient drugs, including the drugs identified herein.

295.    However, throughout the period described herein, Defendants violated the terms of their respective Rebate Agreements by falsely classifying their covered outpatient drugs for the purpose of reducing the rebates owed for those drugs under those agreements.  Specifically, Defendants submitted Quarterly Reports using Form CMS-367 to CMS in which they falsely classified the covered outpatient drugs identified herein as noninnovator multiple source drugs, when in fact the drugs were innovators.  Defendants knew their affirmative false representations regarding those drugs resulted in the creation and submission of false Quarterly Reports to CMS.

296.    Defendants transmitted false Quarterly Reports to CMS knowing that CMS would calculate rebate percentages for Defendants' covered outpatient drugs based upon the inaccurate

representations made therein, and that CMS would transmit those rebate percentages to the

Massachusetts Office of Health and Human Services, the unit of government responsible for

administering the Medicaid program in the Commonwealth of Massachusetts.

297.    Defendants acted knowingly as that term is defined in Mass. Gen. Laws. ch. 12,

§ 5A(a).

298.    In reliance on Defendants' false representations, the Delaware Health and Social

Services Agency paid claims from pharmacies and other suppliers for the drugs identified herein.

Because payment of the claims was conditioned upon Defendants' adherence to the requirements

found in Rebate Agreement, and because the Defendants knowingly violated at least two of the

provisions as described above, the claims were false.

299.    Defendants knowingly caused pharmacies and other suppliers to present false

claims for reimbursement for the drugs listed herein to the Massachusetts Office of Health and

Human Services, in violation of Mass. Gen. Laws. ch. 12, § 5B(1).

300.    Defendants knowingly created and used false records—specifically, false

Quarterly Reports—to get the false claims described herein paid by the Massachusetts Office of

Health and Human Services, in violation of Mass. Gen. Laws. ch. 12, § 5B(2).  Because the

submission of accurate Quarterly Reports was a condition of payment under the Medicaid

program, Defendants intended their misrepresentations to be relied upon by the Massachusetts

Office of Health and Human Services in paying the claims described herein.

301.    The Quarterly Reports trigger invoices from the Massachusetts Office of Health

and Human Services for the rebates owed for the Defendants' covered outpatient drugs.  The

Rebate Agreement requires Defendants to make rebate payments for each calendar quarter within

30 days after receiving invoices from State Medicaid Agencies. The Rebate Agreement requires each Defendant to make a rebate payment on all the Defendant's covered outpatient drugs for as long as an agreement with the Secretary of Health and Human Services is in force and invoices are received from State Medicaid Agencies, including the Massachusetts Office of Health and Human Services.

302. The rebates owed by Defendants during the life of the Rebate Agreement are specific, legal obligations that Defendants have a statutory duty to pay.

303. Defendants knowingly created and used false records—specifically, false Quarterly Reports—to reduce rebates owed to the Massachusetts Office of Health and Human Services pursuant to the Medicaid Drug Rebate Program, in violation of Mass. Gen. Laws. ch. 12, § 5B(8).

304. As a consequence of Defendants' knowing submission of false Quarterly Reports, the Commonwealth of Massachusetts has not received the full rebates to which it was entitled pursuant to the Medicaid Drug Rebate Program.

## COUNT XVIII
## Violations of Va. Code Ann. § 8.01-216.3(A)(1), (A)(2), and (A)(7)

305. Relator realleges and incorporates by reference ¶¶ 1–304 as though fully set forth herein.

306. Defendants knowingly caused the presentation of false claims to the Virginia Department of Medical Assistance Services, in violation of Va. Code Ann. § 8.01-216.3(A)(1); knowingly created and used false records in order to get false claims paid by the Virginia Department of Medical Assistance Services, in violation of Va. Code Ann. § 8.01-216.3(A)(2);

and knowingly created and used false records to decrease their respective obligations to pay rebates to the Virginia Department of Medical Assistance Services pursuant to the Medicaid Drug Rebate Program, in violation of Va. Code Ann. § 8.01-216.3(A)(7).

307.    Medicaid only pays for covered outpatient drugs manufactured by pharmaceutical manufacturers that have entered into a Medicaid Drug Rebate Agreement with the Secretary of Health and Human Services.  Thus, as a condition of Medicaid reimbursement for their covered outpatient drugs, Defendants know that they must enter into and abide by the terms of the Rebate Agreement, including the submission of accurate Quarterly Reports.

308.    Each Defendant has entered into a Rebate Agreement with the Secretary of Health and Human Services in order to authorize payment by State Medicaid Programs for its covered outpatient drugs, including the drugs identified herein.

309.    However, throughout the period described herein, Defendants violated the terms of their respective Rebate Agreements by falsely classifying their covered outpatient drugs for the purpose of reducing the rebates owed for those drugs under those agreements.  Specifically, Defendants submitted Quarterly Reports using Form CMS-367 to CMS in which they falsely classified the covered outpatient drugs identified herein as noninnovator multiple source drugs, when in fact the drugs were innovators.  Defendants knew their affirmative false representations regarding those drugs resulted in the creation and submission of false Quarterly Reports to CMS.

310.    Defendants transmitted false Quarterly Reports to CMS knowing that CMS would calculate rebate percentages for Defendants' covered outpatient drugs based upon the inaccurate representations made therein, and that CMS would transmit those rebate percentages to the Virginia Department of Medical Assistance Services, the unit of government responsible for

administering the Medicaid program in the Commonwealth of Virginia.

311.    The Virginia Department of Medical Assistance Services falls with the definition of "Commonwealth" found in Va. Code Ann. § 8.01-216.2.

312.    Defendants acted knowingly.

313.    In reliance on Defendants' false representations, the Virginia Department of Medical Assistance Services paid claims from pharmacies and other suppliers for the drugs identified herein.  Because payment of the claims was conditioned upon Defendants' adherence to the requirements found in Rebate Agreement, and because the Defendants knowingly violated at least two of the provisions as described above, the claims were false.

314.    Defendants knowingly caused pharmacies and other suppliers to present false claims for reimbursement for the drugs listed herein to the Virginia Department of Medical Assistance Services, in violation of Va. Code Ann. § 8.01-216.3(A)(1).

315.    Defendants knowingly created and used false records—specifically, false Quarterly Reports—to get the false claims described herein paid by the Virginia Department of Medical Assistance Services, in violation of Va. Code Ann. § 8.01-216.3(A)(2). Because the submission of accurate Quarterly Reports was a condition of payment under the Medicaid program, Defendants intended their misrepresentations to be relied upon by the Virginia Department of Medical Assistance Services in paying the claims described herein.

316.    The Quarterly Reports trigger invoices from the Virginia Department of Medical Assistance Services for the rebates owed for the Defendants' covered outpatient drugs.  The Rebate Agreement requires Defendants to make rebate payments for each calendar quarter within 30 days after receiving invoices from State Medicaid Agencies.  The Rebate Agreement requires

each Defendant to make a rebate payment on all the Defendant's covered outpatient drugs for as long as an agreement with the Secretary of Health and Human Services is in force and invoices are received from State Medicaid Agencies, including the Virginia Department of Medical Assistance Services.

317.     The rebates owed by Defendants during the life of the Rebate Agreement are specific, legal obligations that Defendants have a statutory duty to pay.

318.     Defendants knowingly created and used false records—specifically, false Quarterly Reports—to reduce rebates owed to the Virginia Department of Medical Assistance Services pursuant to the Medicaid Drug Rebate Program, in violation of Va. Code Ann. § 8.01-216.3(A)(7).

319.     As a consequence of Defendants' knowing submission of false Quarterly Reports, the Commonwealth of Virginia has not received the full rebates to which it was entitled pursuant to the Medicaid Drug Rebate Program.

### COUNT XIX
### Violations of D.C. Code Ann. § 2-308.14(a)(1), (a)(2), and (a)(7)

320.     Relator realleges and incorporates by reference ¶¶ 1–319 as though fully set forth herein.

321.     Defendants knowingly caused the presentation of false claims to the District of Columbia Department of Human Services, in violation of D.C. Code Ann. § 2-308.14(a)(1); knowingly created and used false records in order to get false claims paid by the District of Columbia Department of Human Services, in violation of D.C. Code Ann. § 2-308.14(a)(2); and knowingly created and used false records to decrease their respective obligations to pay rebates to

the District of Columbia Department of Human Services pursuant to the Medicaid Drug Rebate

Program, in violation of D.C. Code Ann. § 2-308.14(a)(7).

322.    Medicaid only pays for covered outpatient drugs manufactured by pharmaceutical

manufacturers that have entered into a Medicaid Drug Rebate Agreement with the Secretary of

Health and Human Services.  Thus, as a condition of Medicaid reimbursement for their covered

outpatient drugs, Defendants know that they must enter into and abide by the terms of the Rebate

Agreement, including the submission of accurate Quarterly Reports.

323.    Each Defendant has entered into a Rebate Agreement with the Secretary of Health

and Human Services in order to authorize payment by State Medicaid Programs for its covered

outpatient drugs, including the drugs identified herein.

324.    However, throughout the period described herein, Defendants violated the terms

of their respective Rebate Agreements by falsely classifying their covered outpatient drugs for the

purpose of reducing the rebates owed for those drugs under those agreements.  Specifically,

Defendants submitted Quarterly Reports using Form CMS-367 to CMS in which they falsely

classified the covered outpatient drugs identified herein as noninnovator multiple source drugs,

when in fact the drugs were innovators.  Defendants knew their affirmative false representations

regarding those drugs resulted in the creation and submission of false Quarterly Reports to CMS.

325.    Defendants transmitted false Quarterly Reports to CMS knowing that CMS would

calculate rebate percentages for Defendants' covered outpatient drugs based upon the inaccurate

representations made therein, and that CMS would transmit those rebate percentages to the

District of Columbia Department of Human Services, the unit of government responsible for

administering the Medicaid program in the District of Columbia.

326.    Defendants acted knowingly as that term is defined in D.C. Code Ann. § 2-308.13(3).

327.    In reliance on Defendants' false representations, the District of Columbia Department of Human Services paid claims from pharmacies and other suppliers for the drugs identified herein.  Because payment of the claims was conditioned upon Defendants' adherence to the requirements found in Rebate Agreement, and because the Defendants knowingly violated at least two of the provisions as described above, the claims were false.

328.    Defendants knowingly caused pharmacies and other suppliers to present false claims for reimbursement for the drugs listed herein to the District of Columbia Department of Human Services, in violation of D.C. Code Ann. § 2-308.14(a)(1).

329.    Defendants knowingly created and used false records—specifically, false Quarterly Reports—to get the false claims described herein paid by the District of Columbia Department of Human Services, in violation of D.C. Code Ann. § 2-308.14(a)(2).  Because the submission of accurate Quarterly Reports was a condition of payment under the Medicaid program, Defendants intended their misrepresentations to be relied upon by the District of Columbia Department of Human Services in paying the claims described herein.

330.    The Quarterly Reports trigger invoices from the District of Columbia Department of Human Services for the rebates owed for the Defendants' covered outpatient drugs.  The Rebate Agreement requires Defendants to make rebate payments for each calendar quarter within 30 days after receiving invoices from State Medicaid Agencies.  The Rebate Agreement requires each Defendant to make a rebate payment on all the Defendant's covered outpatient drugs for as long as an agreement with the Secretary of Health and Human Services is in force and invoices

are received from State Medicaid Agencies, including the District of Columbia Department of Human Services.

331.    The rebates owed by Defendants during the life of the Rebate Agreement are specific, legal obligations that Defendants have a statutory duty to pay.

332.    Defendants knowingly created and used false records—specifically, false Quarterly Reports—to reduce rebates owed to the District of Columbia Department of Human Services pursuant to the Medicaid Drug Rebate Program, in violation of D.C. Code Ann. § 2-308.14(a)(7).

333.    As a consequence of Defendants' knowing submission of false Quarterly Reports, the District of Columbia has not received the full rebates to which it was entitled pursuant to the Medicaid Drug Rebate Program.

**WHEREFORE,** Relator prays for the following relief:

(1)    Three times the amount of actual damages which the United States and each State on whose behalf Relator sues has sustained as a result of Defendants' conduct;

(2)    A civil penalty of between $5,500 and $11,000 for each violation of the False Claims Act, and civil penalties as applicable for violations of state law;

(3)    30% of all amounts recovered by the United States and States;

(3)    Relator's attorneys' fees, expenses, and costs; and

(4)    Such further relief as the Court finds necessary to make whole Relator and those on whose behalf he brings this action.

Respectfully submitted,

_____

-67-

Kevin B. Kamenetz
Federal Bar No.03548
401 Washington Ave.
Suite 201
Towson, Maryland 21204
Phone: 410-825-0070
Facsimile: 410-825-1794
E-Mail:Kamenetzlaw@comcast.net

Of Counsel:

Kenneth J.  Nolan
Fla. Bar No.: 603406
Marcella Auerbach
Fla. Bar No.: 249335
Nolan & Auerbach, P.A.
435 N. Andrews Ave., #401
Fort Lauderdale, FL 33301
Telephone: (954) 779-3943
Fax: (954) 779-3937

Frederick M. Morgan, Jr.
Jennifer M. Verkamp
Kevin M. Detroy
Morgan Verkamp LLC
700 Walnut Street, Suite 400
Cincinnati, Ohio 45202